**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                             Plaintiff,                **REPORT AND RECOMMENDATION**

    -against-                                **13-CV-5323 (AMD) (ST)**

THE YORKSHIRE GROUP, INC. and
SCOTT PLATTO,

                             Defendants.
---------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

       Plaintiff U.S. Commodity Futures Trading Commission (the "CFTC") brought an

enforcement action against Defendants The Yorkshire Group, Inc. ("Yorkshire") and Scott Platto

on September 25, 2013, alleging violations of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*

(the "Act"). *See* Dkt. No. 1 ("Compl." or the "Complaint"). The CFTC seeks a permanent

injunction to prevent Defendants from violating the Act and engaging in certain commodities

and securities activities, disgorgement of commissions allegedly earned by Defendants, and

imposition of a civil monetary penalty. *See* Dkt. No. 15. Following Defendants' failures to

appear, answer, or otherwise respond to the Complaint despite proper service (*see* Dkt. Nos. 4-

6), the CFTC filed a request for entry of a default by the Clerk of the Court, which was entered

on December 10, 2013. *See* Dkt. No. 8. On December 24, 2013, the CFTC moved for default

judgment against Defendants. *See* Dkt. No. 9. On January 16, 2014, the Honorable Roslynn R.

Mauskopf referred the motion for default judgment to the Honorable Viktor V. Pohorelsky. On

November 18, 2015, the case was reassigned to the Honorable Ann M. Donnelly, and on April 6,

2016, it was reassigned to this Court. On August 10, 2016, a motion hearing was held before the

Court following an Order that was served by the CFTC upon Defendants as directed (*see* Dkt. No. 13); Defendants did not appear for the motion hearing (*see* Dkt. No. 17). Based on a review of all of the well-pleaded allegations and evidence presented in the CFTC's filings and at the August 10, 2016 motion hearing, I respectfully recommend that the motion for default judgment be granted, a permanent injunction be issued, and disgorgement and a civil monetary penalty be imposed.

## I.     BACKGROUND[1]

The CFTC is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the regulations that are promulgated pursuant to the Act, 17 C.F.R. § 1.1 *et seq. See* Compl. ¶ 10. Yorkshire was a telemarketing firm based in Staten Island, New York, that solicited retail customers to execute financed precious metals transactions. *See id.* ¶ 11. Yorkshire ceased operations in August 2012. *See id.* Mr. Platto is an individual who, as of the time of the filing of the Complaint, lived in Staten Island, New York. *See id.* ¶ 12. During the period from September 2011 to August 2012 (the "Relevant Period"), Mr. Platto signed contracts on behalf of Yorkshire, communicated with and solicited customers of Yorkshire, was listed in Yorkshire's corporate records as its president, was the sole signatory on Yorkshire's bank accounts, and resided at the location identified as Yorkshire's corporate address. *See* Dkt. No. 9-3 (Declaration of Philip Rix) ("Rix Decl." or the "Rix Declaration") ¶ 9;

---

[1]     On a motion for default judgment, the Court "deems all the well-pleaded allegations in the pleadings to be admitted." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997); *see also Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 189 (2d Cir. 2015) (affirming liability of defaulting defendant based upon "the factual allegations in the complaint, combined with uncontroverted documentary evidence submitted by plaintiffs").

*see also* Dkt. No. 15-1 (Declaration of Christopher Giglio) ("Giglio Decl." or the "Giglio Declaration") ¶ 8.[2]

During the Relevant Period, Yorkshire acted as a precious metals dealer for a Nevada company called Hunter Wise Commodities, LLC ("Hunter Wise"), and Yorkshire introduced customers to Hunter Wise. *See* Compl. ¶¶ 13, 14; Giglio Decl. ¶¶ 4-6. Yorkshire solicited retail customers to engage in leveraged, margined, or financed transactions in precious metals including gold, silver, platinum, and palladium; most of its business was in financed transactions. *See* Compl. ¶ 19, 27; Giglio Decl. ¶ 7. When Defendants solicited customers for these transactions, Defendants would represent to potential customers that a customer would need only to deposit a small percentage of the total metal value, and that the customer would receive a loan for the remaining amount, which would incur a finance charge, service charge, and other fees. *See* Compl. ¶ 20; Giglio Decl. ¶¶ 4-6 & Ex. A; Rix Decl. ¶ 10. Defendants would also tell customers that they needed to pay a commission on the total value of the metal, up to 15%, as well as a mark-up on the spot price (*i.e.*, price for immediate delivery) of the metal. *See* Compl. ¶ 21; Rix Decl. ¶ 10.

Once a customer had signed a customer account agreement (*see* Giglio Decl. Ex. A) and invested money with Yorkshire, Yorkshire would collect the funds and send them to Hunter Wise, which would provide some support services to Yorkshire and would report the details of the transaction to the customer (*see* Compl. ¶ 22). Yorkshire did not deal in physical metals, did

---

[2]     The Rix Declaration was filed in support of the CFTC's motion for default judgment on December 24, 2013, while the Giglio Declaration was filed in further support of the motion and accompanied the CFTC's supplemental motion papers filed on July 27, 2016 in response to the Court's Order setting a hearing on the motion. As a result of the difference in timing, some information in the Giglio Declaration supplements or amends information from the Rix Declaration to reflect the CFTC's ongoing investigation.

not transfer ownership of any physical metals to customers, and did not disburse any funds as loans or store physical metals in any depository for or on behalf of customers. *See* Rix Decl. ¶ 16 & Ex. M. In fact, neither Yorkshire nor Hunter Wise bought, sold, loaned, stored, or transferred any physical metals for the financed precious metals transactions of Yorkshire's customers, and neither Yorkshire nor Hunter Wise actually delivered any precious metals to any Yorkshire customer. *See* Compl. ¶ 25. Rather, Hunter Wise would make an internal accounting entry on its own books and track the value of each customer's account. *See id.* Therefore, Yorkshire basically charged customers commissions for purchasing metal and interest on loans to buy metal that did not exist. *See id.* ¶ 23.

During the Relevant Period, Yorkshire solicited and introduced to Hunter Wise eleven retail customers; these customers opened nine total customer accounts (two of the accounts were joint accounts shared by two relatives who each signed the customer account agreement). *See* Giglio Decl. ¶ 7.[3] The CFTC conducted interviews with and reasonable investigations into these eleven individuals to ascertain their aggregate investments and investment purposes. *See* Rix Decl. ¶¶ 19, 20; Giglio Decl. ¶ 7. These customers paid $93,700.00 in connection with precious metal transactions, and Yorkshire received commissions in the sum of $29,801.64 from those transactions. *See* Giglio Decl. ¶ 7 & Ex. C. Because of the commissions and fees, these eleven customers could not break even, let alone profit, on these investments. *See* Giglio Decl. Ex. C. None of the precious metal transactions at issue in the Complaint were conducted on or subject to the rules of any board of trade, exchange, contract market, or derivatives transaction execution facility. *See* Compl. ¶¶ 1, 27; Giglio Decl. ¶¶ 4-6.

---

[3]     In its initial filings supporting the motion for default judgment (*see* Dkt. No. 9), the CFTC reported that there were twelve customers, but revised this number to eleven customers in the Giglio Declaration. *See* Giglio Decl. ¶ 7.

## II. DISCUSSION

### A. Jurisdiction and Venue

The Act provides that a district court has jurisdiction over an action brought by the CFTC to enjoin violation of or to enforce compliance with the Act. 7 U.S.C. § 13a-1(a). With the passage of Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, 124 Stat. 1376 (2010), the Act was amended to extend the CFTC's authority over, *inter alia*, certain retail commodity transactions as of July 16, 2011. The Relevant Period began in September 2011. As discussed in more detail below, the transactions at issue in this case were "retail commodity transactions" over which this Court has jurisdiction pursuant to the Act. *See generally* 7 U.S.C. § 2(c)(2)(D).

Venue properly lies with this Court pursuant to the Act because Defendants resided in this District at the time the Complaint was filed and transacted business in this District, and because the alleged acts and practices in violation of the Act occurred within this District. *See* 7 U.S.C. § 13a-1(e).

### B. Liability

The Federal Rules of Civil Procedure prescribe a two-step process for a plaintiff to obtain a default judgment. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, after a default has been entered against a defendant, and the defendant fails to appear or move to set aside the default under Rule 55(c), the Court may, on a plaintiff's motion, enter a default judgment. *See* Fed. R. Civ. P. 55(b)(2).

Once a defendant is found to be in default, he is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *See, e.g., Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). However, a court retains the discretion to determine whether a final default judgment is appropriate. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); *see also Taylor v. 312 Grand St. LLC*, 2016 WL 1122027, at *3 (E.D.N.Y. Mar. 22, 2016) ("[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right.") (citations and internal quotation marks omitted). In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored." *Enron*, 10 F.3d at 95-96.

Thus, despite a defendant's default, the plaintiff bears the burden of demonstrating that the unchallenged allegations and all reasonable inferences drawn from the evidence provided establish the defendant's liability on each asserted cause of action. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). In other words, "after default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010) (citation and internal quotation marks omitted), *report and recommendation adopted by*, 688 F. Supp. 2d 150, 151 (E.D.N.Y. 2010). In this case, the CFTC has established Yorkshire's and Mr. Platto's liability.

As is relevant here, the Act grants the CFTC the authority to regulate certain retail commodity transactions. A commodity transaction is "retail" if it (i) is entered with or offered to "a person that is not an eligible contract participant or eligible commercial entity" and (ii) is

financed or entered into or offered on a leveraged or margined basis. *See* 7 U.S.C. § 2(c)(2)(D)(i).

Here, the transactions at issue were retail commodity transactions under the Act. First, the gold, silver, platinum, and palladium transacted are commodities. *See* 7 U.S.C. § 1a(9). Next, Yorkshire's customers were neither eligible contract participants nor eligible commercial entities. The Act defines an eligible contract participant, *inter alia*, as an individual with discretionary investments of more than $10 million or more than $5 million if the transactions are entered to manage risk associated with an asset owned or liability incurred by the individual or reasonably likely to be owned or incurred. 7 U.S.C. § 1a(18). Based on investigations of and interviews with Yorkshire's customers, the CFTC concluded that none of Yorkshire's eleven customers at issue here met the requirements to be an eligible contract participant. *See* Rix Decl. ¶¶ 19, 20. The Act defines an eligible commercial entity as an eligible contract participant with additional requirements. 7 U.S.C. § 1a(17). Because none of the eleven Yorkshire customers at issue here was an eligible contract participant, none was an eligible commercial entity. Finally, because the eleven Yorkshire customers borrowed money in order to engage in the relevant transactions, the transactions were financed or else entered into on a margined or leveraged basis (*see* Giglio Decl. ¶ 7). *See generally CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 975-978 (11th Cir. 2014) (interpreting statutory terms). These transactions were therefore retail commodity transactions.[4]

---

[4]     There are several exceptions to this definition of retail commodity transaction, none of which apply here. These transactions did not involve securities (*see* Rix Decl., Ex. G), contracts of sale resulting in actual delivery within 28 days (*see* Compl. ¶ 25), or transactions listed on a registered securities exchange (*see* Compl. ¶ 1). *See* 7 U.S.C. § 2(c)(2)(D)(ii).

Such retail commodity transactions are treated under the Act as if they were "contract[s] of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii). The Act makes it unlawful for any person to, *inter alia*, enter into or offer to enter into any transaction in connection with a contract for the purchase or sale of a commodity for future delivery. 7 U.S.C. § 6(a). There is a narrow exception to this provision for a certain transaction that is "conducted on or subject to the rules of a board of trade" designated or registered by the CFTC as a contract market (*id.*), but this exception does not apply because these transactions were not conducted on or subject to the rules of a board of trade (*see* Compl. ¶ 27). Therefore, the retail commodity transactions that Yorkshire solicited were in violation of the Act.

Furthermore, the Act provides that "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter . . . may be held liable for such violation in any action brought by the [CFTC] to the same extent as such controlled person." 7 U.S.C. § 13c(b). In such an action, the CFTC bears "the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." *Id.* Here, the CFTC has alleged that Mr. Platto was the principal and owner of Yorkshire and that Mr. Platto personally solicited customers and signed deals on behalf of the company; Mr. Platto was clearly a controlling person of Yorkshire. *See* Rix Decl. ¶ 9; Giglio Decl. ¶ 8 & Ex. D. By virtue of his role within Yorkshire, the CFTC has successfully alleged both that Mr. Platto had general control over Yorkshire and that he had actual or constructive knowledge of – if not actual control over – Yorkshire's core activities that constitute violations and allowed them to continue. *See CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 504-05 (S.D.N.Y. 2004) (President/CEO liable as controlling person when he "ran [the company's] daily activities, supervised its employees, handled customer complaints, enjoyed

general signatory authority over checking accounts held for [the company], reviewed customer accounts regularly, and knew that [the company's independent contractors] operated under constraints that made it virtually impossible for customers to profit."). Both Yorkshire and Mr. Platto are therefore liable for violations of the Act.

### C.    Permanent Injunction

In addition to monetary relief, a court may grant a permanent injunction on a motion for default judgment. *E.g.*, *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 546 (S.D.N.Y. 2015) (citations omitted). The Act provides that injunctive relief may be obtained if any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder." 7 U.S.C. § 13a-1(a). "Upon a proper showing," a permanent injunction "shall be granted without bond." *Id.* § 13a-1(b). For their part, the Federal Rules of Civil Procedure provide that "[e]very order granting an injunction" must state the reasons why it is being issued; state its terms specifically; and describe in reasonable detail, rather than by referring to the complaint or another document, the acts that are restrained or required. Fed. R. Civ. P. 65(d)(1).

It is well settled law that the equitable standards in cases where government agencies seek statutory injunctive relief are much different from private injunction actions. *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010) (citing *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977), *cert. denied*, 438 U.S. 905 (1978)); *see also CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence."). Here, the CFTC need only demonstrate "a reasonable likelihood that the

wrong will be repeated" and "need not prove irreparable injury or the inadequacy of other remedies." *British Am. Commodity Options*, 560 F.2d at 141; *see CFTC v. Cheung*, 1994 WL 583169, at *2 (S.D.N.Y. Oct. 21, 1994) (to obtain permanent injunction, "the CFTC must establish (1) a prima facie showing of violations of the Act and (2) a 'reasonable likelihood that the wrong will be repeated.'") (citation omitted).

In analyzing the "reasonable likelihood" that the wrong will be repeated, the Court must examine the totality of the circumstances, "and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975) (*quoted in CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677 (S.D.N.Y. 1979)). The likelihood of future violations of law can be inferred from a defendant's past illegal conduct. *British Am. Commodity Options*, 560 F.2d at 142.

The totality of the circumstances here supports the grant of a permanent injunction. Defendants have egregiously failed to answer or appear in this litigation, which commenced nearly three years ago, and even refused to respond to the CFTC's investigation. Defendants' non-participation limits the available evidence for the Court to evaluate, but the uncontroverted allegations and evidence that have been presented in this litigation demonstrate that Defendants' activities were part of a knowing and continuous course of conduct over several months in 2011 and 2012. *See* Giglio Decl. Ex. B; Compl. ¶¶ 19-25. Defendants willfully and repeatedly engaged in unlawful off-exchange retail commodity transactions in violation of the Act, garnering thousands of dollars in fees and commissions from eleven customers who were unable to break even on their investments. *See* Giglio Decl. Ex. C. Therefore, as described more fully below, I respectfully recommend that Defendants be permanently enjoined from violating 7 U.S.C. § 6(a),

from engaging in other commodity transactions, and from taking part in any activity requiring registration or exemption from registration with the CFTC.

### D. Disgorgement

The CFTC also seeks disgorgement of Defendants' gains. The Act provides that the equitable remedy of disgorgement may be imposed "on a proper showing, on any person found . . . to have committed any violation" of the Act. 7 U.S.C. § 13a-1(d)(3)(B).

Joint and several liability is appropriate here. The Act explicitly provides that "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter . . . may be held liable for such violation in any action brought by the [CFTC] to the same extent as such controlled person." 7 U.S.C. § 13c(b); *see SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) ("When apportioning liability for disgorgement among multiple defendants, courts have the discretion to find joint and several liability when two or more individuals collaborate in the illegal conduct. . . . In this case, Haligiannis was clearly responsible for the activities of all three entities.") (citation omitted)). As discussed above, Mr. Platto was integrally involved in Yorkshire's operations and in the unlawful scheme to violate the Act, for which Yorkshire received $29,801.64 in commissions. *See* Giglio Decl. ¶ 7; Compl. ¶ 31. Therefore, I respectfully recommend that the Court order that Yorkshire and Mr. Platto pay, jointly and severally, disgorgement in the amount of $29,801.64, plus post-judgment interest from the date of the entry of judgment pursuant to 28 U.S.C. § 1961. *See, e.g.*, *CFTC v. 4X Solutions, Inc.*, 2015 WL 9943241, at *3 (S.D.N.Y. Dec. 28, 2015) (awarding disgorgement in

"the approximate amount of the Defendants' ill-gotten profits"), *report and recommendation adopted by*, 2016 WL 397672 (S.D.N.Y. Jan. 29, 2016).[5]

### E.     Civil Monetary Penalty

Finally, the CFTC requests the imposition of a civil monetary penalty. The Act provides that the CFTC may seek and the court may impose, on a proper showing, on any person who has committed the violation a civil penalty of no more than the greater of a statutory amount or triple the monetary gain to the person for each violation. 7 U.S.C. § 13a-1(d)(1). By regulation, the statutory amount has been adjusted for inflation to $140,000 for the time period at issue in this case. *See* 17 C.F.R. § 143.8(a)(4)(i)(B)(4).

The court should consider a variety of factors in assessing a civil monetary penalty, and has broad discretion in fashioning an appropriate remedy that is "rationally related to the offense charged or the need for deterrence." *See CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008). In deciding the amount of a civil monetary penalty, "the court should focus on the gravity of the misconduct, considering such factors as (1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) [defendants'] state of mind; (3) the consequences flowing from the violative conduct; and (4) [defendants'] post-violation conduct." *4X Solutions*, 2015 WL 9943241, at *3 (citations and internal quotation marks omitted); *see also CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) ("In evaluating civil penalties under the [Act], we have considered the general seriousness of the violation as well as any particular

---

[5]     Because the CFTC may not receive any disgorged funds, I also respectfully recommend that the National Futures Association, a not-for-profit membership corporation and self-regulatory organization, be appointed as Monitor to collect the disgorged funds and supervise the distribution of such funds to Defendants' customers. *See, e.g.*, *CFTC v. SK Madison Commodities, LLC*, 2014 WL 3887755, at *6 (S.D.N.Y. June 9, 2014) (disgorged funds to be released directly to the National Futures Association, serving as Monitor).

mitigating or aggravating circumstances that exist," such as defendants' scienter). At the same time, the court must be realistic and not assess a penalty that would be impossible to comply with. *See 4X Solutions*, 2015 WL 9943241, at *3.

Here, Defendants' conduct warrants the imposition of significant civil monetary penalties. As discussed above, there is no dispute that Defendants intentionally and repeatedly violated the Act's requirements that leveraged, margined, or financed retail commodity transactions be conducted on a regulated exchange. *See* Giglio Decl. ¶ 7 & Ex. B; Compl. ¶¶ 1, 19-25. Defendants are liable for the eleven violations[6] identified and described in the Complaint and the CFTC's filings in support of its motion for default judgment. *See* Giglio Decl. ¶ 7. Confronted with their wrongdoing, Defendants chose to offer no defense. There is no evidence that Defendants have attempted to remedy their wrongdoing or to return any money to Yorkshire's customers, nor is there evidence of any mitigating factor.

In light of Defendants' failure to comply with the regulatory regime promulgated by the Act, Defendants' scienter (as demonstrated by their intentional acts), the thousands of dollars that Yorkshire's customers lost and that Yorkshire took in commissions, and Defendants' lack of response to the CFTC's investigation or to this lawsuit, I respectfully recommend that Defendants be held jointly and severally liable[7] for the full civil monetary penalty of

---

[6]     The CFTC has persuasively argued that the number of violations is eleven (reflecting the total number of customers), not nine (reflecting the number of accounts opened). Along the lines of the analysis in *Levy*, 541 F.3d at 1111, the Complaint here specifically provides that "[e]ach offer to enter into [or] entrance into . . . an order for a retail commodity transaction made during the relevant time period is alleged as a separate and distinct violation" of the Act (Compl. ¶ 30), meaning that each time that Defendants reached an agreement with one of the eleven customers to enter a retail commodity transaction, there was a unique violation.

[7]     As previously mentioned, in light of the integral and controlling role that Mr. Platto had at Yorkshire, Yorkshire and Mr. Platto should be jointly and severally liable for the civil monetary penalties. *See* 7 U.S.C. § 13c(b) (providing that a controlling person may be held liable "to the same extent" as the controlled person for the controlled person's violations of the Act).

$1,540,000.00, which represents the statutory amount (adjusted for inflation) multiplied by the number of violations. *See CFTC v. iFinix Futures, Inc.*, 2013 WL 5798546, at *9 (E.D.N.Y. Sept. 16, 2013) (applying statutory amount of $140,000 for each of nine violations, for a total civil monetary penalty of $1,260,000).

## III.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends that the CFTC's motion for default judgment be granted. The Court therefore respectfully recommends that the following Order be entered:

### A.    Permanent Injunction

1.    Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined, and prohibited from directly or indirectly offering to enter into, entering into, executing, confirming the execution of, or conducting an office in the United States for the purpose of soliciting, or accepting orders for, or otherwise dealing in retail commodity transactions in violation of 7 U.S.C. § 6(a).

2.    Defendants are also permanently restrained, enjoined, and prohibited from directly or indirectly: (1) trading on or subject to the rules of any registered entity (as defined in 7 U.S.C. § 1a(40)); (2) entering into any transactions involving commodity interests (as defined in 17 C.F.R. § 1.3(yy)) for their own personal account or for any account in which they have a direct or indirect interest; (3) having any commodity interests traded on their behalf; (4) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving

commodity interests; (5) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests; (6) applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided in 17 C.F.R. § 4.14(a)(9); and/or (7) acting as a principal (as defined in 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person (as defined in 7 U.S.C. § 1a(38)) registered, exempted from registration, or required to be registered with the CFTC except as provided in 17 C.F.R. § 4.14(a)(9).

## B. Disgorgement

3. Yorkshire and Mr. Platto shall pay, jointly and severally, disgorgement in the amount of $29,801.64, plus post-judgment interest, within ten (10) days of the date of the entry of this Order (the "Disgorgement Obligation"). Post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

4. To effect payment of the Disgorgement Obligation and the distribution of any disgorgement payments to Defendants' customers, the Court appoints the National Futures Association (the "NFA") as Monitor (the "Monitor"). The Monitor shall collect disgorgement payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any

action or inaction arising from the NFA's appointment as Monitor, other than actions involving fraud.

5. Defendants shall make Disgorgement Obligation payments under this Order to the Monitor in the name "The Yorkshire Group, Inc. and Scott Platto – DISGORGEMENT Fund," and shall send such Disgorgement Obligation payments by electronic funds transfer or by U.S. postal money order, certified check, bank cashier's check, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW, Washington, District of Columbia 20581.

6. The Monitor shall oversee the Disgorgement Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Disgorgement Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such disgorgement payments as civil monetary penalty payments, which the Monitor shall

forward to the CFTC following the instructions for civil monetary penalty payments set forth in Section C, below.

7. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Disgorgement Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment, or other financial institution, wherever located, in order to make partial or total payment toward the Disgorgement Obligation.

8. The Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW, Washington, District of Columbia 20581.

9. The amounts payable to each customer shall not limit the ability of any customer to prove that a greater amount is owed by Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

10. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants who suffered a loss is explicitly made an intended third-party

beneficiary of this Order and may seek to enforce obedience of this Order, to obtain satisfaction of any portion of the disgorgement that has not been paid by Defendants, to ensure continued compliance with any provision of this Order, and to hold Defendants in contempt for any violation of any provision of this Order.

11. To the extent that any funds accrue to the U.S. Treasury for the satisfaction of Defendants' Disgorgement Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

## C.    Civil Monetary Penalty

12. Pursuant to 7 U.S.C. § 13a-1(d)(1)(A), Yorkshire and Mr. Platto shall, jointly and severally, pay a civil monetary penalty in the amount of $1,540,000.00 (which is $140,000 multiplied by the number of Defendants' retail customers (11)), within ten (10) days of the date of the entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961. Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
ATTN: Accounts Receivables
DOT/FAA/MMAC/AMZ-341
CFTC/CPSC/SEC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-7262
nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW, Washington, District of Columbia 20581.

**D.     Provision Related to Monetary Sanctions**

13. <u>Partial Satisfaction</u>: Acceptance by the CFTC or the Monitor of any partial payment of Defendants' Disgorgement Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

**E.     Miscellaneous Provisions**

14. <u>Injunctive and Equitable Relief Provisions</u>: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person

under the authority or control of any of the Defendants, and upon any person

who receives actual notice of this Order, by personal service, email, facsimile,

or otherwise insofar as he or she is acting in active concert or participation

with Defendants.

15. Notice: All notices required to be given by any provision in this Order shall be

sent via certified mail, return receipt requested, as follows:

Notice to CFTC:
Manal M. Sultan
Deputy Director
Division of Enforcement
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, New York 10005

Notice to Monitor:
Daniel Driscoll
Executive Vice President, COO
National Futures Association
300 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606-3447

All such notices to the CFTC or to the Monitor shall reference the name and

docket number of this action.

16. Change of Address/Phone: Until such time as Defendants satisfy in full their

Disgorgement Obligation and CMP Obligation as set forth in this Order,

Defendants shall provide written notice to the CFTC via certified mail of any

change to their telephone number and mailing address within ten (10) calendar

days of the change.

17. Invalidation: If any provision of this Order or if the application of any

provision or circumstance is held invalid, then the remainder of this Order and

the application of the provision to any other person or circumstance shall not be affected by the holding.

18. <u>Continuing Jurisdiction of this Court</u>: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify, or for relief from, the terms of this Order.

## IV.  OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Brooklyn, New York
       August 19, 2016